# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 8, 2003 Session

## STATE OF TENNESSEE v. PRESTON CARTER

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 93-09760 and 93-09761      Jon Kerry Blackwood, Judge**

---

### No. W2000-02204-SC-DDT-DD - Filed September 18, 2003

---

The appeal in this capital case arises from the resentencing of Preston Carter, who originally pleaded guilty and was sentenced to death in 1995 for the felony murders of Thomas and Tensia Jackson. On appeal, this Court reversed the death sentences because the jury had used an outdated verdict form containing the incorrect burden of proof. See State v. Carter, 988 S.W.2d 145 (Tenn. 1999). Following a resentencing hearing, the jury again imposed a sentence of death on both counts, and the Court of Criminal Appeals affirmed. On automatic appeal under Tennessee Code Annotated section 39-13-206(a)(1), we designated the following issues for oral argument:[1] (1) whether the trial court abused its discretion in admitting photographs of the victims' bodies; (2) whether the trial court committed reversible error in excluding certain mitigating evidence; (3) whether the admission of victim impact evidence violated the constitutional provisions against ex post facto laws; and (4) all other issues mandated by Tennessee Code Annotated section 39-13-206(c)(1). Having carefully reviewed these issues, we hold that none warrants reversal of the sentences of death. Accordingly, we affirm the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1) (1991 & Supp. 1993);**
**Judgment of the Court of Criminal Appeals Affirmed**

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a dissenting opinion.

James A. Simmons and Thomas F. Bloom, Nashville, Tennessee, for the appellant, Preston Carter.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Elizabeth T. Ryan, Assistant Attorney General, for the appellee, State of Tennessee.

---

[1]"Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument . . . ." Tenn. R. Sup. Ct. 12.2.

# OPINION

## FACTUAL BACKGROUND

During the early morning hours of May 28, 1993, Carter, accompanied by Darnell Ivory and Louis Anderson, went to a Memphis apartment complex where Thomas and Tensia Jackson resided with their young daughter, Tierney.[2]  The three men were under the mistaken belief that the Jacksons' apartment was the residence of a drug dealer whom they intended to rob.  Carter and Anderson knocked on the door of the Jacksons' apartment.  Mr. Jackson came to the door but did not open it.  Carter and Anderson asked Mr. Jackson "if he [had] anything."  Mr. Jackson replied that he did not know what they were talking about, and he refused to open the door.  The men quickly realized they had the wrong apartment.  Nevertheless, after handing a sawed-off shotgun to Anderson, Carter kicked in the apartment door.

Carter and Anderson entered the Jacksons' apartment and demanded money.  Mr. Jackson was told to call for his wife to "come out" and was forced into a closet.  As Carter searched the apartment for money or drugs, Anderson raped Mrs. Jackson.  According to Carter, Mr. Jackson came at him in an apparent attempt to defend his family.  Carter admitted, however, that he shot Mr. Jackson while Mr. Jackson was crouching in his daughter's bedroom closet.  Carter shot him at point-blank range with the sawed-off shotgun.  Mr. Jackson's brain was literally blown out of his skull, and he died instantly.  Next, Carter found Mrs. Jackson in the bathroom.  She was clad only in a t-shirt, and she was screaming, "Please don't shoot me.  I'll do anything.  Please don't shoot."  Ignoring her pleas to live, Carter shot Mrs. Jackson at close range as she lay on the bathroom floor.  The shotgun pellets entered her left eye, and her brain exploded.  She also died instantly.

Shortly before 4:00 a.m., three of Mr. Jackson's co-workers arrived at the Jacksons' apartment to pick him up for work at a local bakery.  Among the co-workers were Mrs. Jackson's brother, Derrick Lott, and Thomas Jackson's brother, Kenneth Jackson.  They found the front door to the Jacksons' apartment kicked in and the master bedroom ransacked.  Mr. Lott discovered the Jacksons' daughter lying in a pool of blood in the closet with her dead father.  The child had not been physically injured.

On the evening of May 28, 1993, the date of the double homicide, Carter was arrested.  He gave a statement to police admitting that he shot Mr. and Mrs. Jackson.  The sawed-off shotgun Carter used was found in his apartment, and he admitted using this weapon to shoot the two victims.

In addition to proof regarding the circumstances of the murders, the State introduced evidence at the resentencing hearing that Carter had previously been convicted of aggravated robbery with a shotgun.

---

[2]The name of the Jacksons' daughter is sometimes spelled "Tyranny" in the record.  There is also some uncertainty as to the child's age at the time of the murders.  She was either two or three years old.

The State also presented victim impact evidence from two witnesses. Betty Mister, Tensia Jackson's mother, testified that she and her husband have custody of the Jacksons' daughter. Ms. Mister stated that Tierney misses her parents very much and wishes she could share her accomplishments with them. Ms. Mister explained that Thomas and Tensia Jackson had been high school sweethearts and that Mr. Jackson was "like a son of mine." Tensia and her mother shared a very close relationship. Ms. Mister told how Tensia, Ms. Mister's firstborn child, helped to care for her three younger siblings. Tensia Jackson's siblings were deeply affected by her death. According to Ms. Mister, Tensia was extremely close to her brother, Derrick Lott, and Tensia's death "tears him apart." Ms. Mister said that the Jacksons' deaths created a void, especially at family gatherings and holidays. She concluded, "You know, they are missing very much in our lives."

Kenneth Jackson, the second victim impact witness, was the older brother of Thomas Jackson. He had worked with his brother at the bakery, and they had carpooled to work each morning. Kenneth Jackson was present when the bodies of Thomas and Tensia Jackson were discovered. He testified that Thomas and Tensia "were just in love with each other." He described Thomas as a beautiful, good-hearted man who had never been to jail or to "a club." According to Kenneth Jackson, Thomas's main priority had been his wife and his daughter.

In mitigation, Carter presented the testimony of Dr. Joseph Charles Angelillo, a clinical psychologist. Dr. Angelillo interviewed Carter prior to the re-sentencing hearing, reviewed background materials such as Carter's school records and interviews with Carter's friends and family, and administered three tests to Carter. Dr. Angelillo testified that the first test, the Wechsler Adult Intelligence Scale, revealed that Carter had a full scale I.Q. of 78, which was described as being in the "borderline range." Scores below the "borderline" indicate mild retardation. The second test, the Woodstock Johnson Test of Achievement, measures a person's current knowledge. This test showed Carter's proficiency in mathematical calculations at grade level 7.3, in applied mathematics at grade 5.8, in verbal encoding at grade 7.6, and in reading comprehension at grade 11, with a broad scale reading score at the seventh grade level. The third test, the Millon Clinical Multiaxial Inventory, Third Edition, a personality test, showed that Carter has "generalized anxiety disorder" and obsessive-compulsive personality traits. This test also showed that Carter has histrionic personality features, typified by a dramatic and shallow personality and difficulty empathizing with others. According to this test, Carter also possesses schizotypal personality features characteristic of persons who prefer solitude and exhibit eccentric behavior and beliefs. On cross-examination, Dr. Angelillo conceded that Carter is not mentally retarded.

The next witness was Carter, who testified that he had gone through the eighth grade in school and that at the time of resentencing he was twenty-nine years of age and had three children – two boys, eight and seven years old, and a girl, aged nine. He stated that he married in March of 2000 and that his wife visits him in prison on a weekly basis. Carter testified that he had been drinking alcohol and using marijuana all day prior to the double homicide and that he retrieved the sawed-off shotgun from his apartment when he, Anderson, and Ivory decided to commit a robbery. He admitted killing Mr. and Mrs. Jackson, but he asserted that he did not intend to kill anyone when he first went to the apartment. Carter conceded, however, that he knew very soon after he arrived

at the Jacksons' residence that he was at the wrong apartment but that he nonetheless decided to rob the victims.

Carter stated that he did not know why he murdered the Jacksons, and he asked for forgiveness from the victims' families. Carter testified that he had changed since his former days of "just drinking and using drugs and taking things that I wanted." As a result, Carter legally changed his name to "Akil Jahi." "Akil," he explained, means "one who uses reason," and "Jahi" means "dignity." Carter testified that his years in prison taught him "[h]ow precious life is," how to "respect other people and respect authority," and "how to love and [have] compassion toward people." He thinks about the Jacksons all the time, and he asked to be permitted to help others avoid doing what he had done. He has had no disciplinary problems while on death row and missed passing the G.E.D. exam by a single point. He writes poetry and participates in twice-weekly Christian worship services. On cross-examination, Carter admitted that he had been convicted of breaking into and burglarizing a vehicle in 1991 and that he was on probation for a theft conviction when he murdered the Jacksons.

Two employees of the Riverbend Maximum Security Institution, where Carter is on death row, also testified. Brenda K. Morrison, the Inmate Relations Coordinator, testified that Carter poses no disciplinary problems. According to Ms. Morrison, Carter achieved the least restrictive security rating in the shortest possible time. Ms. Morrison described Carter as being "very helpful." In her opinion, Carter "would not have a problem fitting in with the general [prison] population [if a sentence of life were returned]." The second witness, Cheryl Donaldson, a counselor for death row inmates, had daily interaction with Carter for over four years when he worked in an area near her office. Ms. Donaldson testified that Carter never exhibited any violent tendencies and she found him to be trustworthy.

The final mitigation witness was the Reverend Melita Padilla, an ordained United Methodist minister. Ms. Padilla began visiting Carter in 1996 when she was a student at Vanderbilt Divinity School. She visited Carter in prison on a regular basis as part of a program for visitation with death row prisoners. Carter initiated the visitation by placing his name on a list of inmates wishing to receive religious visitors. Ms. Padilla testified that she saw Carter grow as a person, both spiritually and intellectually, during their acquaintance. She read into evidence a letter that Carter had written to her.

Based on this proof, the jury found that the State had proven beyond a reasonable doubt the following two aggravating circumstances applicable to the murders of both Thomas and Tensia Jackson: "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person" and "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(2), (5) (1991 & Supp. 1993). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced Carter to death on both counts.

## PHOTOGRAPHS OF VICTIMS' BODIES

Three color photographs of the victims' bodies at the crime scene were admitted into evidence at the resentencing hearing. Two of these photographs were also admitted at the first sentencing hearing. The first photograph shows Mr. Jackson crouched in a closet and covered with blood. There is a large wound in his head through which part of his brain protrudes. The second photograph shows Mrs. Jackson lying in a pool of blood on the bathroom floor between the wall and the commode. The wound to her left eye is visible. The third photograph, which was admitted only at the resentencing hearing, shows Mrs. Jackson lying on the bathroom floor in a pool of blood. Unlike the second photograph, it shows Mrs. Jackson unclothed from the waist down.

In the first appeal, the Court of Criminal Appeals held that the trial court did not abuse its discretion in admitting the first two photographs. Although the issue was raised in this Court in the first appeal, we did not address the issue. In the appeal of Carter's resentencing, the Court of Criminal Appeals held that, under the doctrine of the "law of the case," the appeal was governed by its prior ruling upholding the trial court's admission of the first two photographs. The Court of Criminal Appeals held that the third photograph was admissible as evidence of the circumstances of the crimes. The court noted that the third photograph was not unfairly prejudicial because the portion of the photograph showing the unclothed part of Mrs. Jackson's body was obscured by shadow.

Carter argues that the photographs were unfairly prejudicial to him because they are gruesome and graphic and have marginal evidentiary value. Carter further contends that the photographs should not have been admitted because they were cumulative to evidence conveyed through the testimony of witnesses. Finally, Carter asserts that an exception to the law of the case doctrine applies because the prior ruling of the Court of Criminal Appeals upholding the trial court's admission of the first two photographs was clearly erroneous.

Under the doctrine of the law of the case, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case, which must be followed upon remand by the trial court and by an appellate court on a second appeal. See State v. Jefferson, 31 S.W.3d 558, 561 (Tenn. 2000) (citing Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998)). However, an issue decided in a prior appeal may be reconsidered if: (1) the evidence offered at the hearing on remand was substantially different from the evidence at the first proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law occurring between the first and second appeal. See id.

In the first appeal, this Court neither addressed nor decided by implication the issue of the admission of the photographs. Therefore, the Court of Criminal Appeals properly applied the law of the case doctrine in upholding the trial court's admission of the first two photographs, even though this Court reversed and remanded for a new sentencing hearing on another ground. Cf. Ladd v. Honda Motor Co., 939 S.W.2d 83, 91 (Tenn. Ct. App. 1996) (holding that law of the case doctrine

does not apply to intermediate appellate court opinions that have been reversed and vacated). As explained below, Carter has failed to show that the prior ruling of the Court of Criminal Appeals was clearly erroneous. Therefore, the Court of Criminal Appeals did not err in applying the law of the case doctrine to the issue of the admissibility of the first two photographs. Because this Court previously did not consider the admissibility of the photographs and did not decide the issue by implication, the law of the case doctrine does not control our review of the issue.

Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). The general rule, announced in Banks, is that photographs of a murder victim's body are admissible if they are "relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. In addition, the admissibility of evidence at the resentencing hearing in this case is governed primarily by Tennessee Code Annotated section 39-13-204(c) (1991 & Supp. 1993), which provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

Accordingly, any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment. See State v. Teague, 897 S.W.2d 248, 250 (Tenn. 1995). This statute does not require, however, that the rules of evidence be completely disregarded. The trial court retains its traditional role in controlling the introduction of evidence, and it may continue to use the rules of evidence to guide its decisions regarding admissibility of evidence in capital sentencing proceedings. See State v. Sims, 45 S.W.3d 1, 14 (Tenn. 2001).

We conclude that the three photographs at issue are relevant as background information because they accurately depict the nature and circumstances of the crimes. The introduction of background information regarding the nature and circumstances of the crime is especially important in cases such as the one before us in which the defendant pleaded guilty. In such cases, the

sentencing jury does not have the benefit of proof normally introduced in the guilt phase of the trial. In this procedural posture, the parties are "entitled to offer evidence relating to the circumstances of the crime so that the sentencing jury will have essential background information 'to ensure that the jury acts from a base of knowledge in sentencing the defendant.'" State v. Adkins, 725 S.W.2d 660, 663 (Tenn. 1987) (quoting State v. Teague, 680 S.W.2d 785, 788 (Tenn. 1984)).

We conclude that the photographs are also relevant for the purpose of establishing the "heinous, atrocious, or cruel" aggravating circumstance for both murders. See Tenn. Code Ann. § 39-13-204(i)(5) (1991 & Supp. 1993). The (i)(5) circumstance states: "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Id. This Court has repeatedly held that photographs relevant to proving the aggravating circumstance that the murder was especially heinous, atrocious, or cruel are admissible in the penalty phase. See State v. Hall, 976 S.W.2d 121, 162 (Tenn. 1998) (appendix); State v. Porterfield, 746 S.W.2d 441, 450 (Tenn. 1988); State v. McNish, 727 S.W.2d 490, 495 (Tenn. 1987). We have held that the anticipation of physical harm to oneself is torturous. See Carter, 988 S.W.2d at 150; State v. Nesbit, 978 S.W.2d 872, 886-87 (Tenn. 1998); State v. Hodges, 944 S.W.2d 346, 358 (Tenn.), cert. denied, 522 U.S. 999 (1997). The contested photographs aid in establishing that the victims suffered torture in the form of severe mental anguish. The jury could infer from these photographs that both victims anticipated physical harm. Mental torture also occurs when a victim hears or anticipates the harm or killing of a spouse and is helpless to assist. See Carter, 988 S.W.2d at 150-51. The jury could reasonably infer from the testimony that Mr. Jackson knew or strongly suspected that his wife was being raped and that he was prevented from helping her. The photograph showing Mrs. Jackson's partially nude body corroborates her rape and is therefore also probative on the question of mental torture. Likewise, the photograph showing Mr. Jackson's body in the closet corroborates testimony that the couple was separated during the violent attack. The jury could reasonably infer from the testimony and the photographs that Mrs. Jackson was likewise helpless to assist her husband and that she heard the shot that killed him while in fear for her own life.

We further conclude that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. We do not consider the photographs excessively gruesome or shocking, especially in light of the graphic testimony in this case. Moreover, while the photographs corroborate testimony presented at the sentencing hearing, the information sought to be conveyed by the photographs, even if cumulative, is clearly admissible. See State v. Morris, 24 S.W.3d 788, 811 (Tenn. 2000) (appendix) (stating that "a relevant photograph is not rendered inadmissible merely because it is cumulative"); see also State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993), cert. denied, 511 U.S. 1046 (1994) (holding that color photographs of deceased victims at crime scene were admissible despite introduction of extensive color videotape showing victims' bodies as they were found); State v. Brown, 836 S.W.2d 530, 551 (Tenn. 1992) (concluding that photographs of the victim's body were admissible despite oral testimony "graphically" describing victim's injuries). Accordingly, we hold that the trial court did not abuse its discretion in admitting the three photographs into evidence at the resentencing hearing.

**MITIGATING EVIDENCE**

Ms. Padilla testified that Carter sent numerous cards, poems, and letters to her over approximately four years and that she had brought these documents with her to court. Defense counsel asked Ms. Padilla to pick one of the letters to read to the jury. The State objected to the letter as hearsay. The trial court overruled this objection and allowed Ms. Padilla to read to the jury a letter dated October 12, 1999. In the letter Carter expresses his gratitude to her for teaching him how to love himself and others. Carter states, "God is . . . our rock that we must keep first as the head of our everyday life." Carter also discusses his use of the law library, conversations with investigators, and the pastor's possible assistance in his defense.

Defense counsel then attempted to introduce into evidence other letters and poems Carter had sent to Ms. Padilla. Counsel argued that these additional letters and poems show Carter's true feelings in a way Carter would be unable to articulate through his testimony. Among the documents that the trial court excluded were three cards, six poems, and two letters. These writings reveal Carter's religious feelings, his remorse, and his friendship with Ms. Padilla. For example, one small hand-decorated card says, "We are safe and secure, for we are in the presence of God . . . for I know whatever challenge we're going through. [sic] He is with us, every step of the way. Peace, Akil." In a letter dated July 11, 1999, Carter tells Ms. Padilla that "I can't change what happened six years ago nor can I blame anyone but myself. I have lived a life of sin not to be that person anymore. No matter how the outcome may be I won't let go of my Lord's mighty hands. Because right now my friend, I owe Him my life."

Although the trial court found that the additional documents were probative of Carter's friendship with Ms. Padilla and of Carter's religious feelings, the court refused to admit them into evidence because these mitigating factors had already been proven through Ms. Padilla's testimony. Carter argues that the trial court committed reversible error by excluding the correspondence. For the following reasons, we hold that the trial court's refusal to admit into evidence the proffered correspondence between Carter and his pastor was error but that the error is harmless beyond a reasonable doubt.

Mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978). Both the Eighth and Fourteenth Amendments to the United States Constitution and Article I, section 16 of the Tennessee Constitution require the sentencing body in capital cases to consider mitigating evidence. See McKoy v. North Carolina, 494 U.S. 433, 442 (1990); State v. Cauthern, 967 S.W.2d 726, 738 (Tenn. 1998); State v. Odom, 928 S.W.2d 18, 30 (Tenn. 1996); State v. Teague, 897 S.W.2d 248, 255 (Tenn. 1995). Consistent with these constitutional dictates, Tennessee Code Annotated section 39-13-204(c) provides that evidence tending to establish any mitigating factors is admissible in a capital sentencing hearing. Such mitigating factors need not be specifically listed in the statute. Tennessee Code Annotated section 39-13-204(j)(9) provides for the admissibility of "any other mitigating factor which is raised by the evidence . . . ." Tennessee Code Annotated section 39-13-204 thus provides for the liberal admission

of mitigation evidence in the penalty phase and ensures that a jury will have as much information as possible in making its sentencing determination.

Carter argues that the proffered correspondence was relevant as a "potential basis upon which a juror could decline to impose the death penalty" and should have been admitted into evidence. Cauthern, 967 S.W.2d at 738-39. We agree. It is well established that "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" Skipper v. South Carolina, 476 U.S. 1, 4 (1986) (quoting Eddings v. Oklahoma, 455 U.S. 104, 114 (1982)). The writings that Carter sought to introduce into evidence in this case were probative of his character. See Penry v. Lynaugh, 492 U.S. 302, 328 (1989) (holding that to ensure reliability that death is the appropriate punishment the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime). Accordingly, we conclude that the writings that Carter sought to introduce into evidence were relevant mitigating evidence. Thus, it was error for the trial court to exclude the proffered correspondence.

Our analysis does not end here, however. We must next consider whether this error was harmless. The exclusion of mitigating evidence is an error of constitutional magnitude. See Cauthern, 967 S.W.2d at 739. It is the State's burden to prove that the error did not affect the verdict and, therefore, was harmless beyond a reasonable doubt. See id.

In Cauthern, this Court found that the trial court's error in refusing to admit a note written by the defendant's son was harmless beyond a reasonable doubt because "the essence of the excluded evidence was presented to the jury in other forms." Id. The Court concluded that the note in which the defendant's son expressed his love and support for his father was presented to the jury through the defendant's testimony and a photograph of the defendant with his son. Id.

In the present case, the letter read to the jury, Carter's testimony, and the testimony of Ms. Padilla conveyed the essence of the contents of the additional documents sought to be introduced into evidence. The letter read to the jury reflects Carter's faith in God and his gratitude to Ms. Padilla for teaching him to love himself and others. Both Ms. Padilla and Carter testified concerning Carter's faith in God. Carter testified that since his incarceration he had learned to respect other people, to respect authority, and to love and have compassion toward people. He testified about Ms. Padilla's visits and about his participation in Christian worship activities each week. He also asked forgiveness from the victims' families. The excluded correspondence reaffirms the letter admitted into evidence as well as the testimony of Ms. Padilla and of Carter.

Carter argues that, unlike the excluded evidence in Cauthern, the State challenged the substance of the testimony he sought to introduce through the excluded evidence. Carter asserts that he was primarily relying on the changes that had occurred in his life as mitigation evidence. The State argued that his new-found religiosity was fraudulent and self-serving. The excluded evidence could have been used to buttress his mitigation evidence and counter the State's argument. Carter therefore contends that the error in excluding the additional letters, poems, and cards cannot be harmless.

We conclude that the content of the excluded correspondence was adequately communicated to the jury through other evidence, including the October 12 letter, Carter's testimony, and Ms. Padilla's testimony. Based on this evidence, the trial court instructed the jury that it could consider, among other factors, "remorse," "religious reformation," and "spiritual development" as non-statutory mitigating factors. The trial court's exclusion of the proffered evidence did not foreclose the sentencing jury's consideration of these mitigating factors in determining Carter's punishment. Moreover, Carter does not claim that the excluded evidence illustrates any additional mitigating factors. Furthermore, the excluded evidence would have had little value in rebutting the State's arguments challenging the assertions of Carter that he had changed and found God. Accordingly, we hold that the error in excluding the correspondence was harmless beyond a reasonable doubt.

## VICTIM IMPACT TESTIMONY

Carter challenges the admission of victim impact evidence in his case, claiming that its admission violated the constitutional provisions prohibiting ex post facto laws. He complains that the pertinent sentencing statute, Tennessee Code Annotated section 39-13-204(c), did not expressly allow such testimony until 1998, five years after the murders of Thomas and Tensia Jackson had occurred. He also argues that the principal case discussing the permissible types of victim impact evidence, State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), was not decided at the time the crimes were committed. We rejected a similar argument recently in State v. Reid, 91 S.W.3d 247, 280 (Tenn. 2002).

As we explained in Reid, "the Ex Post Facto Clause does not by its own terms apply to judicial decisions." Id.; see generally U.S. Const. art. 1, §§ 9, 10; Tenn. Const. art. I, § 11; Rogers v. Tennessee, 532 U.S. 451, 456 (2001). Furthermore, only if an alteration of a common law doctrine of criminal law is "'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue'" will it violate due process. Reid, 91 S.W.3d at 280 (quoting Rogers, 532 U.S. at 461). Nesbit did not change existing law nor apply a new interpretation to Tennessee Code Annotated section 39-13-204, the capital sentencing statute that was in effect when Mr. and Mrs. Jackson were murdered. See id. Therefore, we conclude, as we did in Reid, that Carter's assertion that admitting victim impact evidence constituted an ex post facto violation is without merit.

## MANDATORY REVIEW FACTORS

Tennessee Code Annotated section 39-13-206(c)(1) requires that courts reviewing a sentence of death for first degree murder determine whether:

> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

-10-

(c) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Our review of the record confirms that the sentences in this case were not imposed in an arbitrary fashion. We also conclude that the evidence is sufficient to support the jury's finding that Carter was previously convicted of a violent felony, see Tenn. Code Ann. § 39-13-204(i)(2) (1991 & Supp. 1993), and that the murders in this case were heinous, atrocious, or cruel in that they involved mental torture, see Tenn. Code Ann. § 39-13-204(i)(5) (1991 & Supp. 1993). The proof at the resentencing hearing revealed that on October 20, 1994, approximately three months prior to his conviction in this case, Carter was convicted of aggravated robbery by use of a deadly weapon. This evidence is clearly sufficient to establish that Carter was previously convicted of one or more felonies, other than the present charge, whose statutory elements involved the use of violence to the person.[3] This Court previously determined that the evidence in this case was sufficient to support the (i)(5) aggravator. See Carter, 988 S.W.2d at 150-51 (finding proof in the first sentencing hearing sufficient to support aggravating circumstance (i)(5), particularly as it related to the mental torture present in this case). The same facts upon which we relied in the initial appeal were presented at the resentencing hearing. In addition, there has been no substantial change in the law since the previous appeal, and we do not find our prior ruling erroneous. See State v. Jefferson, 31 S.W.3d 558, 561 (Tenn. 2000). Accordingly, we reach the same conclusion, that the evidence is sufficient to support the (i)(5) aggravating circumstance.

We further conclude that the evidence was sufficient to support the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. In determining whether the evidence supports the jury's finding, the proper standard is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstance(s) outweighed the mitigating circumstance(s) beyond a reasonable doubt. See State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 661 (Tenn. 1997). The evidence is sufficient to support the jury's decision that the two aggravating circumstances outweighed, beyond a reasonable doubt, the various mitigating circumstances presented by Carter (e.g., remorse; rehabilitation since incarceration; lack of future violent tendencies; opportunity to provide positive benefit to society through ability to have contact with inmates in general population; children and wife who need their father/husband; borderline

_____

[3]The State did not rely on the (i)(2) aggravating circumstance at Carter's original sentencing hearing. However, this does not preclude the State from relying on this aggravating circumstance upon resentencing. See State v. Harris, 919 S.W.2d 323, 330-31 (Tenn. 1996) (stating that at resentencing the State may offer proof of any legally valid aggravating circumstance); see also Hodges, 944 S.W.2d at 357 (stating that "so long as a defendant is *convicted* of a violent felony *prior* to the sentencing hearing at which the previous conviction is introduced, this aggravating circumstance is applicable").

-11-

intelligence; schizotypal/personality features, if any; religious reformation; spiritual development; etc.). Given Carter's prior conviction for a violent crime against a person, as well as the torturous manner in which he murdered Thomas and Tensia Jackson, a rational juror could find that the mitigating circumstances did not outweigh the aggravating circumstances beyond a reasonable doubt.

In conducting a comparative proportionality review as required by Tennessee Code Annotated section 39-13-206(c)(1)(D), we have previously stated that

> we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

State v. Powers, 101 S.W.3d 383, 403 (Tenn. 2003) (quoting State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998)) (citations omitted). In considering proportionality, we look at the facts and circumstances of the crimes, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and compare the present case with others in which a defendant was convicted of the same or similar crimes. See State v. Godsey, 60 S.W.3d 759, 782 (Tenn. 2001) (footnote omitted). The pool from which we select similar cases includes "only those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed." Id. at 783. The following factors are useful in identifying and comparing similar cases: (1) the means and manner of death; (2) the motivation for killing; (3) the place of death; (4) the similarity of the victims and treatment of the victims; (5) the absence or presence of premeditation, provocation, and justification; and (6) the injury to and effects on non-decedent victims. See Bland, 958 S.W.2d at 667. In comparing defendants, we consider the following non-exclusive factors: (1) prior criminal history; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) remorse; (7) knowledge of helplessness of victim; and (8) capacity for rehabilitation. See id.

In the present case, Mr. and Mrs. Jackson were innocent victims. The motive for the killings was robbery. Although Carter acknowledged that he realized the Jacksons were not the drug dealers he intended to rob, he and Anderson nonetheless terrorized them. Carter ransacked the Jacksons' apartment looking for money or drugs while his accomplice, Anderson, raped Mrs. Jackson in the

master bedroom. Mr. Jackson was forced into his daughter's bedroom closet. Carter shot both victims in the head, at close range, while their young daughter was present in the apartment.

Carter, who was twenty-four years old at the time he killed Mr. and Mrs. Jackson, confessed to the murders. Proof was presented that he cooperated with the law enforcement officers investigating the murders. Carter was convicted of aggravated robbery prior to his conviction in this case. He is the father of four children and has married since his incarceration. Carter has a "borderline" I.Q. and has been diagnosed with generalized anxiety disorder, obsessive-compulsive disorder, and histrionic and schizotypal personality features. He admitted using drugs and alcohol at the time of the murders. Carter has behaved well in prison, and he has stated that he has learned to love and respect others. His pastor testified about his spiritual and intellectual growth.

Based upon an exhaustive review of the record and Supreme Court Rule 12 reports from trial judges in trials for first degree murder, we conclude that the present case is proportionate when compared to other similar murders in which the death penalty was imposed. The following cases in which the death penalty was imposed bear similarities to the current case: State v. Stout, 46 S.W.3d 689 (Tenn. 2001) (twenty-year-old defendant shot victim once in the head during course of robbery, death sentence upheld based upon (i)(2), (i)(6), and (i)(7) aggravating circumstances, despite evidence that defendant had turned to religion); State v. Sims, 45 S.W.3d 1 (Tenn. 2001) (defendant and co-defendant were burglarizing victim's house when victim came home unexpectedly and defendant shot him in the head, jury applied (i)(2) and (i)(5) aggravators); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (twenty-one-year-old defendant shot victim during robbery and was sentenced to death based upon the sole aggravating factor that he had previously been convicted of a violent felony); State v. Smith, 993 S.W.2d 6 (Tenn. 1999) (twenty-three-year-old defendant admitted to drinking alcohol and taking drugs prior to robbery and murder of victim and cooperated with authorities, death sentence upheld based upon (i)(2) aggravator); State v. Burns, 979 S.W.2d 276 (Tenn. 1998) (twenty-three-year-old defendant shot and killed victim during robbery, death sentence upheld based upon (i)(5) aggravator, despite evidence regarding defendant's religious faith); State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998) (nineteen-year-old defendant shot and tortured victim at victim's house with victim's young children present, death sentence upheld based upon (i)(5) aggravator); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998) (twenty-three-year-old defendant shot victim once in the head when she and her husband returned home to find the defendant and second assailant burglarizing their home, death sentence upheld based upon (i)(2) and (i)(7) aggravators); State v. Howell, 868 S.W.2d 238 (Tenn. 1993) (twenty-seven-year-old defendant shot victim in the head during robbery of convenience store, death sentence upheld based upon (i)(2) aggravator); State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993) (nineteen-year-old defendant shot victim in the head during course of robbery of restaurant, death sentence upheld based upon (i)(5) and (i)(12) aggravators); State v. Harries, 657 S.W.2d 414 (Tenn. 1983) (thirty-one-year-old defendant shot victim in the head during the course of robbing a convenience store, death sentence upheld based upon (i)(2) aggravator). After reviewing these cases, and many others not specifically cited, we conclude that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by Carter and conclude that they do not warrant relief.[4] Carter's sentence of death is affirmed and shall be carried out on the 4th day of February, 2004, unless otherwise ordered by this Court or proper authority. It appearing that the defendant, Preston Carter, is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

---

[4] In a supplemental filing, Carter argues for the first time that his sentences of death must be reversed based upon decisions of the United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002). He contends that according to these decisions the indictment in his case must be dismissed and his convictions vacated because the aggravating circumstances were not charged in the indictment. Carter asserts that Tennessee's statutory scheme of aggravating circumstances is analogous to that of the Federal Death Penalty Act and points out that some federal courts have held that aggravating circumstances must be charged in the indictment. See United States v. Promise, 255 F.3d 150, 152 (4th Cir. 2001) (drug case); United States v. Lentz, 225 F. Supp. 2d 672, 680 (E.D. Va. 2002) (capital case). Because Carter failed to file a motion seeking permission to raise this supplemental issue, it could be considered waived. Carter's argument, however, is without merit. This Court has held that "[n]either the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." State v. Dellinger, 79 S.W.3d 458, 467 (Tenn.), cert. denied, 123 S. Ct. 695 (2002).

-14-