IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 3, 2015

**STATE OF TENNESSEE v. DAVID BURROWS**

**Appeal from the Criminal Court for Shelby County**
**No. 1104221     John Campbell, Judge**

---

**No. W2014-01785-CCA-R3-CD  -  Filed January 12, 2016**

---

Aggrieved of his Shelby County Criminal Court jury convictions of first degree murder and especially aggravated kidnapping, the defendant, David Burrows, appeals, claiming that the trial court erred by refusing to remove a juror for cause, by admitting autopsy photographs of the victim, and by admitting evidence of the defendant's 2008 domestic assault of the victim and that the evidence is insufficient to support his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Eric Scott Hall, Memphis, Tennessee, for the appellant, David Burrows.

Herbert H. Slatery III, Attorney General and Reporter; Jeffery D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Karen Cook and Sam Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Shelby County Grand Jury charged the defendant with one count of first degree felony murder, one count of first degree premeditated murder, and one count of especially aggravated kidnapping in relation to the May 2011 murder of his estranged girlfriend, Marquita Adams.

The evidence adduced at the defendant's May 2014 trial established that the defendant and the victim began a tumultuous romantic relationship in 2006 or 2007. The couple argued frequently, often breaking up only to get back together a short time later. In 2008, one of their arguments resulted in the victim's being taken to the hospital with a

black eye she received at the hands of the defendant. In February 2011, the victim applied for an order of protection against the defendant, but she refused to attend the March hearing date for the order, allowing the case to be dismissed. Around that same time, the defendant sent a threatening text message to the victim's cellular telephone that said, "'I'm going to kill you, you're not going to see the summertime, and I can't live without you.'"

On May 14, 2011, however, the defendant and the victim went together to the home of William Jefferson, where they smoked marijuana and played games on the defendant's laptop computer. In the afternoon, the victim and her three-year-old daughter, left Mr. Jefferson's residence and went to meet the victim's mother, her older daugher, and other family members at the carnival in the parking lot of the Raleigh Springs Mall. Later, the victim and her daughters left and went to pick up the defendant. The group drove to the home of the defendant's sister, Laquita Burrows, where the adults watched a movie and the children went to sleep.

While the defendant and the victim were watching a movie, the victim's cellular telephone rang repeatedly, but she did not answer it. Suspicious of her behavior, the defendant asked the victim why she would not answer her telephone. Eventually, the defendant answered the telephone and heard the voice of another man, whom he believed to be named "Brandon" or "Big B," mocking him. The defendant argued with the man and then took the victim's car keys and cellular telephone and "[t]ried to leave the house" to go to the area where "Big B" was known to hang out. The victim tried to get her keys and telephone, and the defendant pushed her. The victim's older daughter, overheard the defendant tell the victim to "shut up before I kill your kids too" before "trying to take [the victim] down the steps" and "put[ting] her in the driver's side" of her car. The victim shouted, "[N]o, D.J., no." The car started, stopped, and then "squealed off."

The victim drove to a location in front of New Chicago Park, where the couple continued to argue. When the victim tried again to get her cellular telephone from the defendant, the defendant became enraged and struck her in the face, and she fell to the ground. The defendant testified that he kicked the victim in the head and all over her body, saying that he could not recall how many times he struck and kicked the victim as she lay on the ground. He remembered, however, that at one point, he "picked her up and hit her again" and that, when he did so, "[s]he fell straight back and hit the curb." When the defendant realized that the victim was unconscious, he stopped kicking her and "[t]ried to wake her up." Unable to rouse her, the defendant "picked her up and put her on the grass," where she vomited. The defendant then "pulled her to the back [of the car] and then went to the car, opened the trunk." He laid the victim in the trunk and tried to staunch the bleeding from her head with a doll he found in the trunk before placing the victim in the back seat of the car. The victim "started breathing real hard and fast" and

then "just quit breathing." At that point, the defendant "[c]losed the door and started running." After a while, he stopped and ran back to the car, picked up the victim's shoes, which had come off during the beating, and put them in the car, and drove to his grandmother's house. He parked the car and fled into a nearby park.

An autopsy of the victim revealed that the victim suffered multiple blunt force injuries to her head and body. Bruises and abrasions peppered the victim's entire body, and she suffered three rib fractures. The victim suffered a major contusion to her liver. The hemorrhaging caused by the multiple contusions caused the victim to essentially bleed to death internally.

After beating the victim to death, the defendant hitched a ride to Renita Porter's house from a man named "Smokey." He asked Ms. Porter to drive him to the home of "Kinney G" in Frayser. At Kinney G's house, the defendant telephoned his cousin, Sherrick Smith, who agreed to drive the defendant to the home of the defendant's friend, Duke. The defendant stayed with Duke for two days, "[m]ostly sleep[ing]," before he telephoned his cousin, Shanton Smith, who took him to another friend's house. From there, the defendant "just left" and went to St. Louis, where he stayed with his friend, "Da-Da." The defendant "used somebody else's social security card" and birth certificate, which he obtained from his friend, Duke, to get a Missouri state identification. He then purchased a one-way plane ticket to Alaska for $800. The defendant was arrested in Alaska on June 28, 2011.

Based upon this proof, the jury convicted the defendant as charged of first degree premeditated murder, first degree felony murder in the perpetration of a kidnapping, and especially aggravated kidnapping. The trial court merged the first degree murder verdicts into a single judgment of conviction and imposed a sentence of life imprisonment for that conviction. The court imposed a consecutive sentence of 25 years for the aggravated kidnapping conviction, to be served at 100 percent by operation of law. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

*I. Removal of Juror*

The defendant contends that the trial court should have excused Juror Kathy Blose after she reported to the trial court during the trial that she might know the defendant. He acknowledges that the trial court designated Juror Blose an alternate prior to deliberations and that she was not a part of the jury that ultimately convicted him but argues "that the trial court's decision to leave the juror for three full days of trial, after the potential for prejudice and bias had been made known, created a substantial risk of prejudice" to the defendant. The State asserts that the trial court did not err because it

was not clear that Juror Blose "actually knew the defendant, because she said she could be impartial, and most importantly, because she did not actually participate in the jury's deliberations."

The record establishes that on the third day of the defendant's trial, which was the second day of proof, the trial court informed the parties that one of the jurors had told a deputy that she "now thinks she knows the defendant." The trial court and the parties questioned Juror Blose regarding her knowledge of the defendant. She said, "We have some good friends who have a son who is a friend of [the defendant's], and they live on our street, and he has, I believe, been to our house with him." Juror Blose said that any encounter with the defendant would have been "three or four years" before the trial and that her knowledge of the defendant was limited, explaining, "[A]ll I know is that he was raised by his grandmother because that was what my friend had told me, and I just think she made a comment one time about, you know, poor D.J., he's making bad choices in the past in conversation." Juror Blose said that she "didn't recognize [the defendant] but he looks different than he did the last time I saw him" and that she "recognized the grandmother because" she felt she had "seen her maybe somewhere." She reported the name of her son's friend, and the defendant indicated that he did not recognize his name or nickname. Importantly, Juror Blose said that her knowledge of the defendant would not impact her ability to render an impartial verdict. The trial court instructed Juror Blose not to share any information with the rest of the jury.

The trial court noted that it was unclear that Juror Blose had "correctly identified" the defendant and that "if it was two years ago then we know it wasn't the defendant." Ultimately, the court concluded that, because Juror Blose had indicated that her knowledge would not affect her decision making, there was no "reason why she can't continue to serve."

Following the court's ruling and a brief recess, defense counsel indicated that he had spoken with the defendant and that the defendant "does not remember at all meeting her or anything by the name of the person mentioned." Nevertheless, counsel asked that Juror Blose be excused, arguing that "we can't know the extent of what knowledge, if any, she has of the person she believes that's the defendant." Counsel stated that had he been aware of this information during voir dire, he "would have definitely excluded her from the jury." The court observed that it did not appear as though Juror Blose had "tried to mislead anybody" and that the testimony of the defendant's grandmother "is what apparently triggered her recollection of this." The court indicated that it would take the defendant's request under advisement.

At the conclusion of its final charge to the jury, the trial court selected Juror Blose to be one of the alternates. Neither the State nor the defendant objected to the trial court's selection of alternate jurors.

The criminal accused possesses the right to trial by an impartial jury as guaranteed by the state and federal constitutions. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury of the county in which the crime shall have been committed . . . ."). To this end, "[a] court may discharge from service a . . . petit juror . . . who is disqualified from such service, or for any other reasonable or proper cause, to be judged by the court," including "[t]hat a state of mind exists on the juror's part that will prevent the juror from acting impartially." T.C.A. § 22-1-105. Generally, juror disqualifications are based upon one of two theories: (1) *propter defectum* ("On account of or for some defect." *Black's Law Dictionary* 1385 (Rev. 4th Ed. 1968)) or (2) *propter affectum* ("For or on account of some affection or prejudice." *Id.*). Because the defendant complains of bias or partiality against the defendant, his claim is one of *propter affectum*. *See State v. Furlough*, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990).

The defendant complains that the trial court should have excused the challenged juror because she expressed that it was possible that she knew the defendant and that a friend of hers may have mentioned on one occasion that the defendant, as a young man, was "making bad choices." As the Supreme Court has observed, however, "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved" in a trial. *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). Instead, "'[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Id.* at 800. The defendant must "demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Id.* Finally, "irrespective of whether the trial judge should have excluded the . . . challenged jurors for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993) (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)).

Here, the defendant does not allege, and the record does not establish, any actual prejudice on the part of Juror Blose. Indeed, the record does not clearly establish that Juror Blose actually knew the defendant. Moreover, when presented with the opportunity to flesh out the juror's knowledge of the defendant and his previous "bad choices," the defendant did not do so. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful

effect of an error."). Additionally, Juror Blose clearly and unequivocally stated that she could set aside any knowledge she might have had about the defendant and render an impartial verdict based solely on the evidence. *See Murphy*, 421 U.S. at 800. Most importantly, Juror Blose did not actually sit on the jury that convicted the defendant, having been selected as an alternate, and the defendant has not presented any proof that that jury was "'not fair and impartial.'" *See Howell*, 868 S.W.2d at 248. Indeed, the defendant's arguments regarding the potential for impartiality invite this court to engage in nothing more than rank speculation. In consequence, the defendant is not entitled to relief on this issue.

In a related issue, the defendant contends that the trial court erred by failing to follow the process outlined in Tennessee Rule of Criminal Procedure 24 when selecting the alternate jurors in this case. As the State correctly points out, however, the defendant did not lodge a contemporaneous objection to the process employed by the trial court. The defendant's failure to lodge a contemporaneous objection results in a waiver of plenary review of this issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987). Moreover, we see no basis for noticing the error despite waiver. *See* Tenn. R. App. P. 36(b). As indicated above, the defendant failed to establish that the trial court's allowing Juror Blose to remain with the jury during the trial adversely impacted his right to a trial by an impartial jury. He certainly cannot establish that her removal from the jury that ultimately decided the case adversely impacted this or any other substantial right. *See State v. Smith*, 24 S.W.3d 274, 282, 283 (Tenn. 2000) (holding that reviewing court will not recognize the existence of plain error unless the defendant can establish, among other things, that "'a substantial right of the accused [was] adversely affected'").

## II. Autopsy Photographs

The defendant next contends that the trial court erred by admitting into evidence a photograph of the victim taken during the autopsy. The State asserts that the trial court did not err because the photograph assisted the jury in the understanding of Doctor Funte's testimony.

"Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). "The general rule . . . is that photographs of a murder victim's body are admissible if they are

'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *Carter*, 114 S.W.3d at 902 (quoting *Banks*, 564 S.W.2d at 950-51). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant photographs may be excluded, however, if their probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Banks*, 564 S.W.2d at 951. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *State v. Odom*, 336 S.W.3d 541, 565 (Tenn. 2011) (citing Banks, 564 S.W.2d at 949).

The photograph at issue, taken during the autopsy of the victim, shows the victim's head with the scalp retracted to show the multiple areas of hemorrhaging beneath. Before admitting the photograph, the trial court conducted a hearing out of the presence of the jury to determine whether the photograph was necessary to assist Doctor Funte in the presentation of her testimony regarding the victim's injuries. She indicated that this photograph showed more clearly that the victim suffered repeated blows, a fact not readily ascertainable from photographs of the external injuries to the scalp. We conclude that the photograph, though graphic, was not so shocking or gruesome that the probative value of the photograph to negate the defendant's claim that the victim died as the result of a single, accidental blow to the head inflicted when the victim's head struck the curb was substantially outweighed by the danger of unfair prejudice. The defendant is not entitled to relief on this issue.

### III. *Prior Domestic Assault*

The defendant argues that the trial court erred by admitting evidence of the defendant's November 3, 2008 assault of the victim because it was impermissible propensity evidence. The State avers that the trial court did not err because the evidence of the prior assault evinced the defendant's settled purpose to harm the victim.

Prior to trial, the defendant moved the court, pursuant to Tennessee Rule of Evidence 404(b), to exclude certain evidence of the defendant's prior bad acts, including proof of the defendant's November 3, 2008 domestic assault of the victim. With regard to that offense, Laquita Burrows, the defendant's sister, testified that the victim was a cousin to the father of Ms. Burrows' children. Ms. Burrows testfied that in November 2008, the defendant and the victim "got into a altercation" and the victim asked Ms.

Burrows "to take her to the hospital" because the victim's eye was swollen. She said that she did not see the defendant strike the victim on that occasion.

Citing *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993), the trial court ruled that evidence of the November 3, 2008 assault would be admissible as evidence of the defendant's "settled purpose to harm." The court noted that the evidence was also admissible as to the defendant's intent to murder the victim. The court also concluded that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent, theorizing that such evidence is probative of the defendant's mens rea at the time of the homicide because it reveals a "settled purpose" to harm the victim. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *see also State v. Turnbill*, 640 S.W.2d 40, 46-7 (Tenn. Crim. App. 1982). Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *Id.*

In our view, evidence of the defendant's prior assault of the victim fits squarely within the *Smith* rule. The evidence established the violent nature of their relationship and the defendant's hostility toward the victim. Moreover, any error occasioned by the admission of this evidence would be harmless in light of the overwhelming proof of the defendant's guilt.

*IV. Sufficiency*

Finally, the defendant challenges the sufficiency of the convicting evidence, pointing to inconsistencies in the proof and arguing that, because he "was never sufficiently free from excitement and passion as to be capable of premeditation," he was "[a]t the most," guilty of voluntary manslaughter. He argues, as to his conviction of especially aggravated kidnapping, that he did not "ever confine [the victim] or force her to move from one place to another against her will." The State contends that the evidence was sufficient to support both convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another" and "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." T.C.A. § 39-13-202(a)(1).

With regard to premeditation, code section 39-13-202 explains:

As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the

-10-

killing, *see, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001), including "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

In our view, the evidence adduced at trial overwhelmingly supports the defendant's convictions of first degree murder. The defendant, enraged by the victim's receiving a telephone call from another man, forced the victim into her car. They drove to a separate location, where he savagely beat the victim to death. The defendant struck and kicked the victim multiple times, causing massive internal hemorrhaging. After beating the victim to death, the defendant put her lifeless body into her car and drove the car to his grandmother's house, where he left it. The defendant fled to a nearby park, laid low in Memphis for a few days, and then fled to Missouri, where he obtained a falsified identification and a plane ticket to Alaska. The repeated blows inflicted upon the unarmed victim and the defendant's cool planning following her death support the jury's finding of premeditation.

"Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302: . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . or . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-305(a)(1), (4).

The evidence also supports the defendant's conviction of especially aggravated kidnapping. The proof, viewed in the light most favorable to the State, established that the defendant forced the victim against her will from Ms. Burrows' residence and into the victim's car. Zacyrah testified that the defendant physically pushed the victim from the residence even as the victim shouted for him to stop. The pair drove to a second location, where the defendant beat the victim to death.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-11-