# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 11, 2007

## STATE OF TENNESSEE v. DANA KEITH WOODS

**Appeal from the Circuit Court for Madison County**
**No. 04-892     Donald H. Allen, Judge**

---

**No. W2006-00657-CCA-R3-CD  - Filed December 26, 2007**

---

The Defendant, Dana Keith Woods, was convicted of first degree premeditated murder, felony murder, attempted first degree murder, aggravated assault, aggravated burglary, and especially aggravated kidnapping.  The trial court merged the convictions for first degree premeditated murder and felony murder and also merged the convictions for attempted first degree murder and aggravated assault.  For these convictions, the Defendant received an effective sentence of life imprisonment without the possibility of parole plus fifty years.  In this direct appeal, the Defendant raises the following issues for our review: (1) whether the trial court abused its discretion by admitting photographs of the victim; (2) whether the evidence was sufficient to support his convictions; (3) whether the trial court erred in failing to instruct on voluntary intoxication; and (4) whether the trial court erred by imposing consecutive sentences.[1]  Following a review of the record and the applicable authorities, we affirm the Defendant's convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Marty McAfee, Memphis, Tennessee (at trial) and Gregory D. Gookin, Assistant Public Defender, Jackson, Tennessee (on appeal), for the appellant, Dana Keith Woods.

Robert E. Cooper, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Jerry Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Ms. Gwendolyn Steele, one of the victims in this case, resided in Jackson and maintained two jobs there.  During the morning of August 23, 2004, Ms. Steele was working at her part-time job at

---

[1] We have renumbered and reordered the issues as stated by the Defendant in his brief.

a funeral home, when she encountered her ex-fiancé, the Defendant. A brief conversation ensued. The Defendant walked into the office of the funeral home and said "hello" to Ms. Steele, who then replied "hi." The encounter ended. According to Ms. Steele, she did not know why the Defendant was at the funeral home.

Ms. Steele then proceeded to her full-time job at Jackson-Madison County General Hospital. Around 11:00 or 11:30 a.m. on August 23, the Defendant phoned Ms. Steele at work, asking her how she was and whether she wanted something to eat. Ms. Steele responded that she did not want anything to eat, and the conversation ended.

Ms. Steele worked at the hospital until approximately 7:30 p.m. When she returned home from work, her childhood friend, Terry Dixson, the other victim in this case, had parked his car in front of her house and was sitting on her front porch waiting on her. Ms. Steele knew that Mr. Dixson "was coming by," but she did not know when. Following Ms. Steele's arrival, the two went inside. Mr. Dixson dried his clothes and watched television in Ms. Steele's bedroom, and Ms. Steele watched television in her living room. The two talked periodically throughout the evening. Later in the evening, Ms. Steele went into the bedroom and laid down on the bed to watch television with Mr. Dixson. According to Ms. Steele, Mr. Dixson had his shirt off; he was lying under the covers; she was lying on top of the covers; and she did not know whether Mr. Dixson had any pants on. Ms. Steele testified that, at this time, the doors to her home were locked.

Around 11:00 p.m., Ms. Steele "saw the door move." At first, she thought only that her niece, Tamika Montae Anthony, who also lived in the residence, had come home. However, a few seconds later, "the door came open and [the Defendant] was standing there." Ms. Steele asked the Defendant why he was in her home, and the Defendant "said something smart" and "turned like he was going to leave . . . ." The Defendant then "turned immediately back around and he started shooting." Steele recalled "multiple" gunshots—six or seven. Ms. Steele testified that she did not own a gun and that there were not any guns in her home.

After the shots were fired, Ms. Steele started screaming. The Defendant then grabbed Ms. Steele by the arm and pulled her across the bed. Ms. Steele was pleading that she did not want to go; however, the Defendant told her "to come on" and, if she did not comply, he would shoot her again. The Defendant pulled her across her backyard and forced her into his burgundy Ford Explorer, which was parked behind her house. The Defendant began driving around Jackson. Ms. Steele noticed blood on her shirt, and she "could feel blood dripping from [her] chest." She testified that "[her] mind was telling . . . [her] to pull back or to open the door with this hand but [she] couldn't use it . . . ."

The Defendant stopped the vehicle at his house, and Ms. Steele requested to go to the hospital. The Defendant ignored her and went inside the house. By the time she got the vehicle door open and made it to the front porch, the Defendant was already exiting the house, and he ordered her to get back inside the vehicle.

The Defendant pushed Ms. Steele back into the car and drove back to Ms. Steele's house. The Defendant quickly went inside the house. When he returned, he proceeded to a gas station close to Interstate 40. While at the gas station, Ms. Steele observed the gun between the Defendant's "belt and his pants."

The Defendant got gas and again began driving. He proceeded to Memphis via Interstate 40. Ms. Steele persisted in requesting medical treatment, but the Defendant refused. Once they arrived in Memphis, the Defendant went to his cousin's, Marie Haynes, house and exited his vehicle. The Defendant returned and ordered Ms. Steele to get out of the car and go into the house. Ms. Steele testified that she could not determine whether anyone was inside the house and that the Defendant put her in a bedroom. After a few minutes, the Defendant pulled Ms. Steele from the bedroom and back outside. Ms. Steele did observe some children at this point and heard Marie ask, "Where are you going?" Ms. Steele was again forced into the automobile.

The Defendant first stopped at a convenience store and then drove back to Jackson. Ms. Steele again requested to go to the hospital, to no avail. According to Ms. Steele, there was "constant verbal abuse" during the ride back to Jackson.

Upon arriving in Jackson, the Defendant drove past Ms. Steele's house and saw Ms. Steele's car at the home. The Defendant tried to call her niece, but no one answered the telephone. The Defendant then drove to his niece's house and parked there for a few minutes. Neither the Defendant nor Ms. Steele ever went into the house. The Defendant then proceeded to his nephew's house, but he could not get the door open. Once back inside the car, he again drove around the city of Jackson. After observing police cars "lined along the street" near his house, the Defendant again drove to Interstate 40 and proceeded to the Brownsville area. He exited the interstate, turned around, and went back to Jackson.

While returning to Jackson, the Defendant received a call from his mother. She informed the Defendant that the police were at his house, looking for Ms. Steele. The Defendant then placed a call; he told Ms. Steele that he had phoned the police department and was going to "turn his self [sic] in."

The Defendant drove to one of the residences they had visited earlier in the evening. After orders from the Defendant, Ms. Steele followed him into the house, where she observed a man named "Gary." Gary refused to let the Defendant leave with Ms. Steele. The Defendant left the residence, and Gary phoned the authorities.

Emergency personnel arrived to assist Ms. Steele, and she was transported to the hospital around 6:30 a.m. Ms. Steele was admitted to surgery, and a bullet was removed from her wrist. Ms. Steele also required additional surgeries to her right shoulder due to a gunshot wound. Ms. Steele testified that she possibly required more surgeries and that two bullets still remained in her body at the time of trial.

Regarding her prior relationship with the Defendant, Ms. Steele testified that she had known the Defendant since junior high. She stated that she began dating him in February of 2004 and that the relationship ended in June of 2004. During this time, the two became engaged. According to Ms. Steele she had seen the Defendant several times since their relationship ended but that it was not "a dating-type of relationship[.]" On August 6 or 7, Ms. Steele had an argument with the Defendant and discovered that the Defendant had a key to her house. Following this incident, Ms. Steele had the locks to her home changed. Ms. Steele admitted to having multiple telephone conversations with the Defendant between June and August of 2004.

When Ms. Steele was asked if she knew what happened to the Defendant's weapon, she stated that she did not know what the Defendant had done with the gun. According to Ms. Steele, she believed the Defendant to be in possession of the gun "the whole time" on the evening of August 23, and she was afraid of him. She confirmed that she did not voluntarily go with the Defendant and that she did not feel free to go anywhere else. She also stated that the Defendant did not have her permission to come inside her home.

Ms. Steele's neighbors, Ms. Glenda Bonds and her son, Patrick Tyler Burdine, were at home on the night of the shooting. Ms. Bonds described the gunfire as "a round of shots[;]" they were "consistent." Mr. Burdine stated that "[t]hey sound like they were repeating to me."

Ms. Steele's niece, Tamika Montae Anthony, returned to Ms. Steele's house on August 23, 2004, between 11:00 and 11:30 p.m. The door was locked, and she had to use her key to gain entry. When she went inside, she noticed that the "window was up." She went to investigate and discovered that the "air conditioner was on the ground." She "didn't think anything of it[,]" closed the window, and proceeded to her room. As she walked through the house, she observed the door ajar to Ms. Steele's bedroom. She looked toward the room and saw Mr. Dixson lying on the bed naked with his arm hanging off the bed. Ms. Anthony called out for Ms. Steele. After receiving no response, Ms. Anthony went to her room and went to sleep. She woke up around 3:30 a.m. and again went to Ms. Steele's bedroom, where she observed that Mr. Dixson was still in the same position. Ms. Anthony then phoned her aunt, Cinta James. Her aunt, Shonette Johnson, arrived at the house shortly thereafter. The police were contacted and arrived on the scene.

Lieutenant Mike Holt of the Violent Crimes Unit of the Jackson Police Department arrived at the residence at approximately 4:40 a.m. Lieutenant Holt observed Terry Dixson's body in Ms. Steele's bed. He was "lying face up on the bed with his right hand . . . under his head. . . . [H]e had some type of traumatic injury to his head." After moving the body, it was determined that Mr. Dixson had suffered a gunshot wound to the head. Lieutenant Holt also located other blood in the room:

> [I]t looked like as if someone else had been in the bed and also been shot and then coming across him there was a trail of blood drops that went across the comforter as it was pulled or appeared to have been pulled toward his side of the bed or toward the door of the room.

Lieutenant Holt stated that the "trail of blood that came across Mr. Dixson continued out of the bedroom door and out and along the foyer through the living room and appeared to go out the front door and even actually out onto the porch." The blood was later to determined to be Ms. Steele's.

Lieutenant Holt testified that he observed the air conditioner on the ground outside a window of the residence. Next to the window was a gas meter. According to Lt. Holt, the gas meter "appeared to have been disturbed and on the top as though just stepped up onto it."

Blood was also found at Marie Haynes' home, the location where the Defendant and Ms. Steele stopped in Memphis. Ms. Haynes observed a female with the Defendant, but she could not identify her. The blood discovered at her home was later determined to be Ms. Steele's.

Mr. Robin James, Cinta James' husband, testified that he was with the Defendant on August 23 just prior to the shooting. According to Mr. James, he and the Defendant were working on the Defendant's truck. They began at the Defendant's house and then moved the truck to Mr. James' house. They quit working on the truck around 7:00 or 7:30 p.m. Following their work, they "had a couple of drinks." When asked what the Defendant was drinking and how much he drank, Mr. James stated that the Defendant was drinking vodka mixed with cranberry juice in "large size glasses, maybe twelve ounces" and that the Defendant consumed "probably more than" two drinks and "maybe" as many as five drinks. After drinking, the men were hungry, so they proceeded to Back Yard Burgers restaurant around 9:30 p.m. They ordered food to go, and the Defendant was dropped off at his house.

Following an autopsy, it was determined that Mr. Dixson died from multiple gunshot wounds to the head. The bullet fragments taken from both victims were determined to be "22 caliber long rifle projectiles." A "Remington 22 short cartridge case . . . was . . . identified as recovered from the subject's vehicle." Additionally, a "rifle casing . . . CCI 22 standard" was found at Marie Haynes' house.

Authorities located the Defendant on September 9, and he was placed in the city jail in Jackson. Jeff Shepard, a Violent Crimes Investigator for the Jackson Police Department, interviewed the Defendant. After receiving his Miranda warnings, the Defendant denied shooting Mr. Dixson. He claimed that Ms. Steele pulled a gun on him, that they struggled, and that the gun went off. According to the Defendant, he gained control of the gun. Then, Ms. Steele appeared to be reaching under the bed for another weapon, and he shot at her twice. He further claimed that he wanted Ms. Steele to receive medical treatment but that she refused. The Defendant also stated that he threw the gun out the window while driving down Interstate 40.

The Defendant was indicted in Count 1 for the first degree premeditated murder of Terry Dixson, in Count 2 for the murder of Terry Dixson during the perpetration of a burglary (felony murder), in Count 3 for aggravated burglary, in Count 4 for the especially aggravated kidnapping of Gwendolyn Steele, in Count 5 for the attempted first degree murder of Gwendolyn Steele, and in Count 6 for the aggravated assault of Gwendolyn Steele. The jury found the Defendant guilty as

charged. For these convictions, the Defendant received an effective sentence of life imprisonment without parole plus fifty years. Following the denial of his motion for a new trial, the Defendant appealed.

## ANALYSIS

### I. Admission of Photographs

The Defendant claims the trial court erred in allowing into evidence photographs of the victim, Terry Dixson.[2] The State introduced into evidence two photographic exhibits that displayed the deceased victim as he was discovered by officers. One was a close range shot of the victim's head, showing wounds and blood; the other was a view of the bedroom from the doorway, which showed the naked victim lying on the bed.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Our supreme court has further stated that the "general rule, announced in Banks, is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003) (quoting Banks, 564 S.W.2d at 950-51). However, before a photograph may be entered into evidence, it must be relevant to an issue that the jury must decide, and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993) (citation omitted); see also Tenn. R. Evid. 401, 403. Additionally, "'the admissibility of photographs lies with the discretion of the trial court'" whose ruling "'will not be overturned on appeal except upon a clear showing of an abuse of discretion.'" State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005) (quoting Banks, 564 S.W.2d at 949).

The Defendant argues that the photographs were more prejudicial than probative given that the victim "was dead, and defense counsel was willing to stipulate to this fact, as well as agreeing that [the Defendant] had actually shot [the victim]." Defense counsel objected to the photographs, and the trial court overruled the objection, concluding as follows:

> I'm going to overrule the objection. Obviously the State has to prove who this individual was and I assume from this photograph that [t]he witness may be able to identify the individual and so, the [c]ourt will overrule because I don't see anything that's really overly prejudicial about this photograph.

---

[2] It is unclear if the Defendant is challenging one or both photographs entered into evidence by the State. The Defendant's brief only references one photograph—the photograph showing the victim lying on the bed. However, he also incorrectly states that only one photograph was entered into evidence. At trial, references were made to the facial photograph of the victim, in addition to the one where the victim was lying on the bed, and both were admitted into evidence. Defense counsel stated that he was "a little concerned about the blood and gore," which is only apparent in the facial shot. We have reviewed both photos and will address the admissibility of both photographs.

The photographs were relevant to identify the victim, to show the appearance and condition of the crime scene, to depict the nature and circumstances of the murder, and to corroborate the testimony of Gwendolyn Steele. Although there is some blood in the facial photograph, the photograph does not provide a close view of the victim's wounds. The photographs were not excessively gruesome or unnecessarily cumulative. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photographs into evidence.

## II. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence for his convictions.[3] Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

### A. First degree murder of Terry Dixson

The Defendant was convicted of first degree murder, which is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion. Tenn. Code Ann. § 39-13-202(d). An intentional act

---

[3] The Defendant does not contest the sufficiency of the evidence supporting his felony murder or aggravated assault convictions. Those convictions were merged into his convictions for first degree premeditated murder and attempted first degree murder respectively.

requires that the person have the desire to engage in the conduct. Tenn. Code Ann. § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the offense. Bland, 958 S.W.2d at 660; State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Our supreme court has noted the following non-exclusive factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Bland, 958 S.W.2d at 660.

The Defendant argues that the evidence was insufficient to support his conviction for first degree murder and that he should have instead been convicted of voluntary manslaughter. We agree with the State that the evidence is sufficient to support a conviction for first degree premeditated murder. The proof, in the light most favorable to the State, showed that Mr. Dixson's car was parked in front of Ms. Steele's residence and that the vehicle was observable to anyone who drove past the house. The Defendant parked his vehicle behind the residence and procured a weapon. He then removed the air conditioner from a window and went inside Ms. Steele's home. After entering the home, he approached the bedroom, opened the door, and pulled out the weapon. Mr. Dixson was unarmed and lying in the bed talking to Ms. Steele. The Defendant "said something smart" and "turned like he was going to leave . . . ." The Defendant then "turned immediately back around and he started shooting." He fired the gun multiple times, and Terry Dixson died from gunshot wounds to the head. The evidence presented at trial was consistent with the jury's guilty verdict of first degree premeditated murder and is sufficient to support the conviction beyond a reasonable doubt.

## B. Attempted first degree murder of Gwendolyn Steele

The Defendant was also convicted for the attempted first degree murder of Gwendolyn Steele. The Defendant contends that a "more appropriate verdict" would have been a conviction for attempted voluntary manslaughter. To support an attempted first degree murder conviction, the State must prove the elements of first degree murder and criminal attempt. In the present case, criminal attempt requires that one act ["with the kind of culpability otherwise required for the offense . . . [and] with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense."] Tenn. Code Ann. § 39-12-101(a)(3).

Viewed in the light most favorable to the prosecution, the evidence supports the jury's verdict that the Defendant took a substantial step toward murdering Ms. Steele. The Defendant parked behind Ms. Steele's residence, removed the air conditioner, and entered her home. He was armed. The Defendant went to the bedroom and shot Ms. Steele three times. He then dragged her out of the house and refused to allow her to seek medical treatment, driving her around for hours. Again, there was clear evidence of the intent to kill and premeditation. The State produced sufficient evidence for a rational trier of fact to find the Defendant guilty of attempted first degree murder beyond a reasonable doubt.

## C. Aggravated burglary

The crime of aggravated burglary is committed when a person (1) without the effective consent of the property owner (2) enters a habitation or remains concealed in such habitation, and (3) has the intent to commit a felony, theft or assault, or does commit or attempt to commit a felony, theft or assault. Tenn. Code Ann. §§ 39-14-402, -403. The Defendant contends that he "only formed felonious intent once he witnessed Ms. Steele and Mr. Dixson occupying the same bed." Having already determined the existence of premeditation, we disagree.

Ms. Steele testified that the Defendant did not have her consent to enter her home and that the doors to her home were locked. An air conditioner was found on the ground outside a window of Ms. Steele's residence. Next to the window was a gas meter, and the gas meter "appeared to have been disturbed and on the top as though just stepped up onto it." Ms. Steele had previously had her locks changed when she discovered the Defendant had a key to her home. The Defendant entered the residence armed and shot Mr. Dixson and Ms. Steele. He then forcibly removed Ms. Steele from the residence. The evidence was sufficient to prove the elements of aggravated burglary.

## D. Especially aggravated kidnapping

One is guilty of especially aggravated kidnapping when that person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and the crime is "accomplished with a deadly weapon . . . ." Tenn. Code Ann. §§ 39-13-302(a), -305. The Defendant argues that the evidence is insufficient to support his conviction because he did not interfere with Ms. Steele's liberty as she "had different opportunities to flee from him, and did not do so."

Again, we must view the evidence in the light most favorable to the State, as a conviction removes the presumption of innocence and imposes a presumption of guilt. Ms. Steele testified that, after the shots were fired, she began screaming. The Defendant grabbed her by the arm and pulled her across the bed. Ms. Steele had been shot three times and was taken against her will from her home. She pleaded with the Defendant that she did not want to go; however, the Defendant told her "to come on" and, if she did not comply, then he would shoot her again. According to Ms. Steele, she believed the Defendant to be in possession of the gun "the whole time" they drove around that evening, and she was afraid of him. The Defendant refused to provide Ms. Steele with medical treatment. She confirmed that she did not voluntarily go with the Defendant and that she did not feel free to go anywhere else. Ms. Steele only received treatment when "Gary" intervened. There is sufficient evidence for a reasonable jury to determine beyond a reasonable doubt that the Defendant committed the crime of especially aggravated kidnapping.

## III. Voluntary Intoxication

The Defendant next complains that the trial court erred by failing to instruct the jury with regard to the effects of his voluntary intoxication. Our Code provides that, while voluntary intoxication is not a defense to prosecution for an offense, evidence of such intoxication may be admitted to negate a culpable mental state. See Tenn. Code Ann. § 39-11-503(a); see also State v.

Phipps, 883 S.W.2d 138, 148 (Tenn. Crim. App. 1994).  In Harrell v. State, this Court set forth the rule as to when the proof requires a voluntary intoxication instruction:

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. . . .  The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

593 S.W.2d 664, 672 (Tenn. Crim. App. 1979).  A defendant has a constitutional right to an instruction on voluntary intoxication if fairly raised by the proof.  See State v. Williamson, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995) (citations omitted).

To support his argument that an instruction on voluntary intoxication was warranted, the Defendant points to Robin James' testimony that the Defendant had consumed alcohol on the evening of the murder.  Robin James testified that, around 7:00 or 7:30 p.m. on the evening of the murder, he and the Defendant began drinking after working on a truck.  According to Mr. James, the Defendant was drinking vodka mixed with cranberry juice in "large size glasses, maybe twelve ounces[,]" and he consumed "probably more than" two drinks and "maybe" as many as five.  At approximately 9:30 p.m., they left Mr. James' house and went to Back Yard Burgers restaurant to get something to eat.  After getting food to go, the Defendant was dropped off at his house.

Following the Defendant's request for an instruction on voluntary intoxication, the trial court found that "there wasn't any testimony that anybody was intoxicated" and that therefore an instruction was not warranted.  While concluding that the evidence did not warrant an instruction, the trial court permitted defense counsel to argue the Defendant's intoxication to the jury during closing argument.  At the motion for new trial hearing, the trial court noted, "[T]here was never any testimony offered by any witness that [the Defendant] was intoxicated.  Just because you have a couple of drinks, I don't think is enough to show that someone is intoxicated."

The Defendant correctly notes that a defendant "has a constitutional right to a correct and complete charge of the law."  (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)).  However, in our view, the record does not contain evidence that the Defendant's intoxication rendered him incapable of acting with the specific intent required to commit murder, attempted murder, aggravated burglary, and especially aggravated kidnapping.  We agree with the trial court that the evidence does not support an instruction on voluntary intoxication.

## IV.  Consecutive Sentencing

The Defendant contends that the trial court erred in ordering consecutive sentencing.  The jury imposed a sentence of life imprisonment without parole for both the first degree murder and felony murder convictions, finding as an aggravated circumstance that the Defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person.  See Tenn. Code Ann. § 39-13-204(i)(2).  At a subsequent

sentencing, the trial court merged the convictions for first degree premeditated murder and felony murder and also merged the convictions for attempted first degree murder and aggravated assault. The trial court imposed a ten-year sentence at 35% for the aggravated burglary conviction, a forty-year sentence at 100% for the especially aggravated kidnapping conviction, and a forty-year sentence at 35% for the attempted first degree murder conviction.

Regarding the manner of service, the trial court ordered the Defendant's forty-year sentences for especially aggravated kidnapping and attempted first degree murder to be served concurrently to one another. This effective forty-year sentence was to be served consecutively to his ten-year sentence for aggravated burglary, and both of these sentences were to be served consecutively to the life without parole sentence. The Defendant's effective sentence of life without parole plus fifty years was also to be served consecutively to a prior sentence for two counts of aggravated assault and one count of reckless endangerment involving use of a deadly weapon. Finally, the trial court ordered the Defendant to pay $2500.00 in restitution to the mother of Terry Dixson and $500.00 to Gwendolyn Steele for the clean-up of her home and an additional unspecified amount for her medical bills not covered by insurance.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that

a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

On appeal, the Defendant only challenges the imposition of consecutive sentencing. At this juncture, we briefly note that the proof supported the aggravating circumstance found by the jury. The State introduced evidence of the Defendant's previous conviction for aggravated assault and that this conviction involved the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2). Regarding consecutive sentencing, the trial court found three bases to support such a decision—the Defendant had a record of extensive criminal activity; he was a dangerous offender whose behavior indicated little or no regard for human life, and he had no hesitation about committing a crime in which the risk to human life was high; and the Defendant was being sentenced for offenses committed while on probation. See Tenn. Code Ann. § 40-35-115(b)(2), (4), (6).

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of the following criteria applies:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

In State v. Wilkerson, our supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: The court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. 905 S.W.2d 933, 937-38 (Tenn. 1995). Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also "guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" Imfeld, 70 S.W.3d at 708 (quoting Tenn. Code Ann. §§ 40-35-102(1), -103(2)); State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999)).

In this case, the trial court found that the Defendant was eligible for consecutive sentences based upon his extensive criminal record, his classification as a dangerous offender, and the fact that he committed the offenses while on probation. See Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). The trial court properly considered the applicable statutory factors for consecutive sentencing and stated on the record the reasons for imposing consecutive sentences. The Defendant does not dispute these findings on appeal, acknowledging that "he had several prior felony convictions" and that "he was on probation when the offenses in the instant case were committed." Instead, the crux of the Defendant's argument is that his aggregate sentence is excessive.

We conclude that the effective sentence is neither unduly severe nor undeserved. The Defendant, who was forty-three years old at the time of sentencing, had a lengthy criminal record dating back to 1984. His convictions included felony escape, robbery, evading arrest, forgery over $500.00, assault with the intent to commit murder in the first degree, reckless endangerment involving the use of a deadly weapon, use of a firearm during the commission of felony, and three counts of aggravated assault. The Defendant had previously violated the conditions of his parole. According to the presentence report, his parole was revoked on May 26, 1989; on January 17, 1990 (for receiving additional felony convictions); and again on October 13, 1997, (after he had absconded from supervision). When the Defendant committed the present offenses, he was on probation for two counts of aggravated assault and one count of reckless endangerment involving the use of a deadly weapon.

Upon de novo review, we conclude that the evidence contained in the record supports the trial court's finding as the proof established that the aggregate sentence imposed is justly deserved and no greater than that deserved for the offenses committed. Therefore, we affirm the imposition of consecutive sentences.

**CONCLUSION**

Based on the foregoing reasoning and authorities, we conclude that admission of the photographs of the victim was not error, that the evidence was sufficient to support the Defendant's convictions, that an instruction for voluntary intoxication was not warranted by the proof, and that the sentence imposed was not excessive. The judgments of the Madison County Circuit Court are affirmed.

_____
DAVID H. WELLES, JUDGE