# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 12, 2015 Session

## STATE OF TENNESSEE v. DONALD W. HIGGINS III

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-2978     Seth Norman, Judge**

---

### No. M2014-01171-CCA-R3-CD – Filed July 27, 2015

---

The defendant, Donald W. Higgins III, appeals his Davidson County Criminal Court jury conviction of aggravated child neglect, claiming that the evidence is insufficient to support his conviction, that the trial court erred by admitting photographs of the victim's injuries, that the trial court erred by refusing to play at trial a portion of his recorded pretrial interview with the police, that the trial court erred by refusing to instruct the jury that a violation of the duty to report was a lesser included offense of aggravated child neglect, and by imposing a Range II sentence. Because the evidence adduced at trial was insufficient to support the defendant's conviction of aggravated child neglect, that conviction is reversed, and the charge is dismissed.

## Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed and Dismissed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Richard Strong (on appeal); and Kelly Young and Holly Troutman (at trial), Nashville, Tennessee for the appellant, Donald W. Higgins III.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Davidson County Criminal Court jury convicted the defendant of one count of aggravated child neglect for allegedly aiding in Suzanne Wiley's neglect of her daughter, M.D.[1]

---

[1] As is the policy of this court, we refer to the minor victim by her initials.

Doctor Deborah Lowen, a pediatrician at Vanderbilt Children's Hospital who was also a specialist in child abuse injuries, testified that she examined M.D. on August 3, 2011, following M.D.'s August 2, 2011 hospital admission. At that time, the victim's mother informed Doctor Lowen that she first observed burns on the victim's body on July 29, 2011. The victim's mother said that she put ointment and gauze onto the victim's blistered and peeling skin and that she gave the victim Tylenol for the pain.

Doctor Lowen explained that the victim suffered second- and third-degree burns to "between 20 and 30 percent of her body surface area from the buttocks down involving both legs and the genital area." At the time Doctor Lowen examined the victim, "[t]he skin was off and peeling." She said that when the injury was fresh, the skin would have blistered and that "[o]ver time the areas that were blistered will then pop and that skin will come off also." She testified that burns such as those suffered by the victim "will leak a lot of fluid," leading to dehydration. The victim was dehydrated when she arrived at the hospital.

Doctor Lowen testified that, had the victim been brought to the hospital immediately after the injuries, she would have been treated with pain medication and provided a lot of intravenous fluids to ward off dehydration. She said that the victim's injuries would have been treated with sterile ointments and wrapped in sterile gauze that would have been changed on a set schedule.

Doctor Lowen said that the victim's wounds "needed to be cleaned extensively because they hadn't been" and that she required skin grafting to the deepest part of the wounds. She testified that the victim had undergone "a dozen surgical procedures" between the time of her initial hospitalization and the February 2014 trial and that she would require more procedures as she grew in order to minimize scarring and allow her to have a full range of motion in her ankles.

According to Doctor Lowen, proper care for the victim's wounds could not occur outside of a hospital setting. She opined that the delay in medical care increased the victim's scarring "[b]ecause the skin had a chance to start redeveloping, re-growing, in a non-healthy way." She added, "By the time she came in for medical care it was to[o] late to intervene in that process and to get it growing the correct way, and the burn surgeon is very clear about that also."

During cross-examination, Doctor Lowen clarified that she did not actually treat the victim but instead acted as "a consultant" in the victim's case. Doctor Lowen stated that the victim's mother told her that the victim had been burned when the victim turned on the hot water in the bathtub. She said that the victim's injuries were not

consistent with the victim's having brief exposure to hot water running from the faucet but were consistent with the victim's having been "[p]laced into a tub of hot water." Doctor Lowen agreed that third-degree burns are not actually painful because burns that severe actually destroy the nerve endings. The second-degree burns, she said, would have been very painful. She said that the victim would likely have manifested that pain by crying, becoming lethargic, and not eating as much. Those signs of distress should have been obvious to the victim's mother. Doctor Lowen said that she had no contact with the defendant and had never even heard his name until she got the subpoena to testify in this case.

Carey King, the victim's maternal grandfather, testified that he spoke to the victim's mother on August 2, 2011, and learned that the victim had been burned. Mr. King asked the victim's mother to bring the victim to his store, where he was working on that day, so that he could examine the victim. When they arrived, the victim's mother was carrying the victim, who was "wrapped in a towel and she was very lethargic, very pale in color." When he opened the blanket to look at the injuries, he "was shocked, horrified, and taken aback at the extent of the injury." He recalled that the victim was wearing a shirt and a diaper and that her legs were wrapped in gauze. He said that he asked Ms. Wiley why she had not taken the victim to the hospital. He then telephoned his wife and Vanderbilt Children's Hospital. His wife drove the victim and the victim's mother to the hospital while Mr. King stayed behind to lock up his store.

Mr. King testified that the victim's mother "told so many stories" about how the victim received her injuries "that we can't even get them back right now." He said that, as far as he knew, no version provided by the victim's mother was the truth. He acknowledged that the victim's mother was resistant to taking the victim for treatment and that he "told her she needed to bring [the victim] out" so that he could examine the wounds. He explained that he "was in Special Forces and . . . was trained in understanding wounds, so [he] would have been able to tell her what she needed to do." Mr. King said that he had never met or heard of the defendant.

Lorelei King, the victim's maternal grandmother, testified that she telephoned the victim's mother on August 2, 2011, because she had been unable to get in touch with her the day before. Ms. King said that her daughter had not previously indicated that she had been staying with relatives of her boyfriend. She stated that she did not even know that the victim's mother had become involved with a man named Jarico Huey. Ms. King recalled that when she told the victim's mother that she sensed that something was wrong, the victim's mother began to cry. After some "probing," the victim's mother told Ms. King that the victim had been burned. Ms. King said that she told the victim's mother to telephone Mr. King, explaining, "I knew that he would be able to extract the information from her and figure out what was wrong."

-3-

Ms. King testified that her husband telephoned her a few minutes later and told her to come to their store. When she arrived, Mr. King brought the victim out to her car "wrapped back up in a blanket, put her in a car seat, and told [Ms. King] to take her directly to the hospital." Ms. King recalled that the victim "was bleeding, she was wet, weeping, and black like charred." She said that the victim asked for a drink "because she was thirsty" and that when she handed the victim a bottle of water, the victim "kept drinking and drinking."

Ms. King testified that prior to her telephone call with the victim's mother on August 2, 2011, she had no knowledge of any injury to the victim. She said that she and her husband, not the victim's mother, insisted that the victim be taken to the hospital.

Ms. King said that since the victim's initial hospitalization, the victim had undergone "about 18" different surgeries and procedures, all of which had required general anesthesia. Only two of those procedures involved skin grafts, both of which occurred during the initial hospitalization. She said that one of the skin grafts was designed to save the victim's left foot, which the doctor had indicated might require amputation.

During cross-examination, Ms. King said that she spoke with the victim's mother approximately three times between the Friday when the victim received her injuries and the Tuesday when she discovered that the victim had been injured. She said that the victim's mother never indicated that the victim had suffered any injury. Ms. King also spoke to the victim, who was 18 months old at the time, and that the victim cried and asked to come to Ms. King's house. Ms. King said that it was not unusual for the victim to cry to come to her house. Ms. King said that the victim's mother told her that the victim had been in her care during the entire time following her injury. The victim's mother told Ms. King that she did not take the victim to the hospital because she was "[s]cared they were going to take her baby away."

Metropolitan Nashville Police Department ("Metro") Detective Michael Dale Clark testified that he investigated the victim's injuries. As part of that investigation, he asked the mother to provide a reenactment of the circumstances surrounding the injuries. The reenactment took place at a residence on Coventry Way. While at the residence, Detective Clark examined the water heater and determined that it was set to a temperature of "approximately 140 to 145." He tested the faucet on the bathtub and determined that the peak temperature of the water coming from that faucet was 145 degrees and that the faucet reached that temperature after approximately 15 seconds.

-4-

Metro Detective John Grubbs testified that he spoke with Doctor Lowen on August 3, 2011, and then interviewed Ms. King and the victim's mother. At that time, the victim's mother did not suggest that anyone else had been involved in the victim's injuries. During a follow-up interview on August 18, 2011, Detective Grubbs learned that the victim's mother was at work when the victim received her injuries. At that point, he conducted another interview of the victim's mother, and she told him that the victim had been with her boyfriend, Jarico Huey, when she was injured. Mr. Huey admitted during an interview with Detective Grubbs that he had caused the burns by placing the victim into scalding water.

During that second interview, the victim's mother also indicated that she and Mr. Huey "took [the victim] to another address where they remained for a period of four to five days." That other address was the residence where Mr. Huey lived with his family. Detective Grubbs later learned through interviews with Mr. Huey's family members that Mr. Huey's grandmother, mother, and the defendant, who is Mr. Huey's brother, along with the defendant's girlfriend, Candace Bennett, had all been present at the residence at some point while the injured victim was there. Detective Grubbs said that the defendant lived at that residence, which was owned by his grandmother, but he could not say with any certainty how often the defendant had been in the residence during the relevant period. Detective Grubbs testified that none of those individuals made any attempt to report the victim's injuries to the police or to the Department of Children's Services.

Detective Grubbs interviewed the defendant, and an audio recording of a portion of that interview was played for the jury.

During cross-examination, Detective Grubbs acknowledged that friends of the victim's mother initially colluded with the victim's mother to conceal the fact that the victim was in Mr. Huey's care when she received her injuries. When the victim's mother finally acknowledged that she had been untruthful about the source of the victim's injuries, she did not indicate that the defendant had been present when the victim was injured. The defendant is not related to the victim or the victim's mother, and he was not present at the Coventry Way address when the injury occurred. That address was the residence of the victim and her mother. The defendant had never resided at that address. The detective's investigation revealed only that the defendant and Ms. Bennett had seen the victim's injuries once while the victim and her mother were at the defendant's grandmother's house and that, after seeing the injuries, the defendant and Ms. Bennett then went to the store to purchase supplies to treat the injuries. The detective acknowledged that no evidence existed to show that the defendant had seen the victim more than one time after her injury.

At the conclusion of Detective Grubbs's testimony, the State rested. Following a full *Momon* colloquy, the defendant elected not to testify and chose to present no proof. After the jury convicted the defendant of aggravated child neglect, the trial court imposed a Range II sentence of 28 years' incarceration. The defendant filed a timely but unsuccessful motion for a new trial followed by a timely notice of appeal.

In this appeal, the defendant challenges the sufficiency of the convicting evidence, the trial court's evidentiary rulings, the trial court's failure to provide an instruction on a violation of the statutory duty to report child abuse as a lesser included offense of aggravated child neglect, and the sentence imposed by the trial court.

*I. Sufficiency*

The defendant first asserts that the evidence was insufficient to support his conviction because the State failed to establish that the defendant had a legal duty to protect M.D. The State contends that the evidence showed that the defendant voluntarily assumed a duty of care with regard to M.D. and that he was criminally responsible for the victim's mother's failure to seek medical treatment for the child's injuries.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Tennessee Code Annotated section 39-15-401(b) provides:

Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the

child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.

T.C.A. § 39-15-401(b). As charged in this case, an act of child neglect is classified as aggravated child neglect when "[t]he act of . . . neglect . . . results in serious bodily injury to the child." *Id.* § 39-15-402(a)(1).

The offense of child neglect has three elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." *State v. Sherman*, 266 S.W.3d 395, 404 (Tenn. 2008) (citing *State v. Mateyko*, 53 S.W.3d 666, 670 (Tenn. 2001); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)). Discussing when the failure to act may give rise to criminal culpability under the statute, our supreme court has held that "[i]n order to establish neglect, the State must first prove that a defendant owes a legal duty to the child." *Sherman*, 266 S.W.3d at 404 (citing *Mateyko*, 53 S.W.3d at 671). The court added,

> In order to be found guilty of a criminal omission, one must have knowledge of the circumstances that give rise to the duty. Moreover, our child neglect statute contemplates that the conduct constituting the offense be made knowingly. A defendant's duty to act must arise from a legal duty; a mere moral obligation will not suffice.

*Sherman*, 266 S.W.3d at 404 (citations omitted). "Ordinarily, the legal duty envisioned by section 39-15-401(a), along with the knowledge of such a duty, arises from a relationship with a child victim." *Id.* at 405.

In *Sherman*, our supreme court concluded that a relationship giving rise to a legal duty exists, and criminal liability for child neglect may be found, when a person stands *in loco parentis*. *Id.* Whether a person is standing *in loco parentis* depends upon the intent of the individual, and a fact-finder may infer that intent from circumstantial evidence, including "the child's age, the child's dependence upon the person claimed to be *in loco parentis*, and whether that person supports the child and exercises the duties and obligations of a natural parent." *Id.* at 406-07.

Utilizing these factors, we conclude that the State presented no evidence that the defendant intended to establish an *in loco parentis* relationship with the victim. At all relevant times, the victim remained under the exclusive care and control of her mother, who expressed resistance to any suggestion of medical treatment for the victim.

No evidence suggested that the victim was dependent upon the defendant, that the defendant supported the victim, or that the defendant undertook "the duties and obligations of a natural parent" with regard to the victim. Indeed, the evidence, in the light most favorable to the State, established that the defendant's brother, Jarico Huey, burned the victim by submerging her into hot water while at Ms. Wiley's residence. At some point after the victim was burned but before Ms. Wiley spoke to Mr. King and agreed to get medical treatment for the victim, the defendant and his girlfriend, Candace Bennett observed at least part of the injuries to the victim's leg. The defendant told Ms. Wiley that she should take the victim to the hospital, but when she refused, the couple went to the store, where Ms. Bennett procured ointment and gauze to treat the victim's injuries. None of the facts adduced at trial supported a conclusion that the defendant knowingly neglected M.D.

The State argues on appeal, as it did in the trial court, that the defendant was criminally responsible for Ms. Wiley's neglect of the victim and thus guilty of aggravated child neglect.

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). As is pertinent here,

> A person is criminally responsible for an offense committed
> by the conduct of another, if:
>
> (2) Acting with intent to promote or assist the commission of
> the offense, or to benefit in the proceeds or results of the
> offense, the person solicits, directs, aids, or attempts to aid
> another person to commit the offense; or
>
> (3) Having a duty imposed by law or voluntarily undertaken
> to prevent commission of the offense and acting with intent to
> benefit in the proceeds or results of the offense, or to promote
> or assist its commission, the person fails to make a reasonable
> effort to prevent commission of the offense.

*Id.* § 39-11-402(a)(2)-(3). "To prove guilt through a theory of criminal responsibility, the State must establish that the defendant 'knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime.'" *Sherman*, 266 S.W.3d at 408 (quoting *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *see also Dorantes*, 331 S.W.3d at 386 (observing that "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the

-8-

crime and promoted its commission"). Although "[m]ere presence during the commission of a crime is insufficient to support a conviction," the State need not show that the defendant physically took part in the crime, "encouragement of the principal is sufficient." *Sherman*, 266 S.W.3d at 408.

The State argues that the defendant, acting out of a motive to protect his brother from criminal charges, knowingly aided the victim's mother in her neglect of the victim. The evidence clearly established that Ms. Wiley neglected the victim and that the victim suffered serious bodily injuries that led to a lasting impact on her physical health. No evidence established, however, that the defendant "knowingly, voluntarily, and with shared intent" united with Ms. Wiley in the commission of that offense. In the light most favorable to the State, the evidence showed that the defendant saw the victim only once after she was burned but before she was taken for medical treatment. Although the State argues that the defendant could have seen the victim while the victim and her mother were staying with the defendant's relatives, they presented no actual proof that he did. Additionally, no proof established that the defendant knew that Mr. Huey had caused the victim's injuries, that Mr. Huey had done so other than by accidental means, or that Mr. Huey would face criminal charges for the injuries. Suggesting that the defendant acted out of a motive to protect his brother under these circumstances is mere speculation.

Moreover, the defendant's assisting with the procuring of supplies so that Ms. Bennett could treat the victim's injuries does not, in our view, evince that the defendant shared Ms. Wiley's intent to withhold medical treatment from the victim. Indeed, the treatment facilitated by the defendant was the only medical treatment the victim received. No proof exists that the defendant actively discouraged Ms. Wiley from seeking medical treatment for the victim or prevented her from doing so. *See Dorantes*, 331 S.W.3d at 386-87 (affirming conviction when evidence established that Dorantes "knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission" because he "was not willing to allow others to either observe the seriousness of the victim's injuries or ascertain his need for intensive medical treatment"). Mr. and Ms. King's testimony established Ms. Wiley's resistance to taking the victim to the hospital. Finally, we cannot say that the defendant's admitted suggestion to Ms. Wiley that the victim's injuries "might not be so bad," which was based upon his own experience with having been burned as a child, rises to the level of active encouragement required for a conviction of being criminally responsible for the conduct of another. Because the evidence did not establish that the defendant, "[a]cting with intent to promote or assist" in Ms. Wiley's neglect of the victim, aided or attempted to aid Ms. Wiley in the commission of that offense, we conclude that the evidence was insufficient to establish that the defendant was criminally responsible for Ms. Wiley's neglect of the victim under the terms of Code section 39-11-402(a)(2).

We also conclude that the evidence was insufficient to establish that the defendant was criminally responsible for the neglect of the victim under the terms of Code section 39-11-402(a)(3). "Subdivision (3) sets forth what criminal liability is imposed upon offenders who neglect their duty with intent to benefit from, promote, or assist in the commission of an offense." *Id.*, Sentencing Comm'n Comments; *see also State v. Jackie Caldwell*, No. E2008-00307-CCA-R3-CD (Tenn. Crim. App., Knoxville, Oct. 6, 2009); *State v. Larry E. Rathbone*, No. E2007-00602-CCA-R3-CD, slip op. at 9 ("According to the comments to Tennessee Code Annotated section 39-11-402, subdivision (3) places criminal liability in the situation where a person who has a legal duty to prevent the crime fails to do so with the specific intent to further the crime."). This court has held that "subdivision (3) relates to situations where a person may be criminally responsible for the conduct of another by failing to act" and observed "that 'for criminal liability to attach, it must be found that there was a legal duty to act and not simply a moral duty.'" *Larry E. Rathbone*, slip op. at 9 (quoting *State v. Jeffrey Lloyd Winders*, No. 8-142-III, 1989 WL 105710, at *2-3 (Tenn. Crim. App., Nashville, Sept. 14, 1989)). We also cautioned that the language of the statute did not suggest that the legislature intended "'to require every citizen to exercise an affirmative duty "imposed by law" to prevent the commission of a crime'" but instead intended to limit liability under the statute "'to members of law enforcement agencies and others (such as care givers or custodial parents) vested with a specific duty to prevent a crime from occurring'" and "'to those who have voluntarily undertaken to prevent commission of the offense.'" *Larry E. Rathbone*, slip op. at 10 (quoting *State v. Michael Tyrone Gordon*, No. 01C01-9605-CR-00213 (Tenn. Crim. App., Nashville, Sept. 18, 1997)).

As discussed more fully above, the defendant bore no legal duty to the victim, and therefore he was not "vested with a specific duty" to prevent the neglect of the victim. Additionally, the record showed that, at all relevant times, the victim was within the exclusive care and control of her mother. Moreover, we cannot say that the defendant's procuring of supplies to treat the victim's injuries evinced his intent to voluntarily assume the role of the victim's caretaker, particularly given the undisputed evidence that the defendant saw the victim only once and that Ms. Wiley did not show the defendant the full extent of the victim's injuries. Finally, "subdivision (3) of the criminal responsibility statute not only requires a legal duty, but also requires that the individual act with a culpable mental state, specifically, the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense." *Larry E. Rathbone*, slip op. at 11. We have already concluded that the evidence did not sufficiently establish that the defendant acted with the intent to promote or assist in Ms. Wiley's neglect of the victim.

Consequently, because the evidence was insufficient to establish that the defendant was criminally responsible for Ms. Wiley's neglect of the victim, the

defendant's conviction of aggravated child neglect is reversed, and the charge is dismissed.

Although we have concluded that insufficiency of evidence requires that the defendant's conviction be reversed and the charge dismissed, we review the remaining issues to facilitate any further appellate review.

## II. Photographs

The defendant next contends that the trial court erred by admitting photographs of the victim's injuries taken when she went to the hospital for treatment. He argues that, because he was willing to stipulate that the victim suffered serious bodily injury in the form of second- and third-degree burns, the only purpose of the entry of the photographs was to inflame the passions of the jury. The State argues that the photographs were relevant to show that "the defendant was aware of the injuries, and in spite of this knowledge, assisted and encouraged" the victim's mother not to seek medical treatment for the victim.

"Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). "The general rule . . . is that photographs . . . are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *Carter*, 114 S.W.3d at 902 (quoting *Banks*, 564 S.W.2d at 950–51). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant photographs may be excluded, however, if their probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950–51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Banks*, 564 S.W.2d at 951. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *State v. Odom*, 336 S.W.3d 541, 565 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949).

The photographs admitted in this case certainly confirm that the victim suffered serious bodily injury, an element of aggravated child neglect. That being said, the photographs were not particularly relevant to the defendant's knowledge of the victim's injuries because the photographs were taken several days after the defendant had seen the injuries and because the proof established that the defendant had not seen the full extent of the injuries. The danger for unfair prejudice certainly exists here, where the

photographs depict terrible injuries to an 18-month-old child. Although it is a close question, we conclude that the trial court did not abuse its discretion by admitting the photographs in this case.

### III. Defendant's Statement

The defendant avers that the trial court erred by refusing to play the entire content of his audio recorded statement to the police under the rule of completeness. The State asserts that the trial court did not err because the unplayed portion of the statement contained inadmissible hearsay.

Unfortunately for the defendant, the entire, unredacted recording does not appear in the record on appeal. Without hearing the recording, we cannot assess the impact of the trial court's exclusion of the evidence. When the trial court makes a ruling excluding evidence, the party offering the evidence is obliged to make an offer of proof to preserve the issue for review. *See* Tenn. R. Evid. 103(a)(2) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."); *see also State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."); *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986) ("In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner."). Furthermore, the appellant bears the burden of preparing an adequate record on appeal. *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

### IV. Lesser Included Offenses

The defendant contends that the trial court erred by refusing to instruct the jury that a violation of the duty to report under Code section 37-1-412 is a lesser included offense of aggravated child neglect as charged in this case. The State asserts that the trial court committed no error.

Prior to trial, the defendant moved the trial court to instruct the jury that a violation of the duty to report as defined in Code section 37-1-412 is a lesser included offense of aggravated child neglect. The trial court refused.

Tennessee Code Annotated section 40-18-110 provides, in pertinent part, as follows:

An offense is a lesser included offense if:

(1) All of its statutory elements are included within the statutory elements of the offense charged;

(2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);

(3) The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or

(4) The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

*Id.* § 40-18-110(f).

Our Code defines aggravated child neglect, as charged in this case, as follows:

(a) A person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . :

(1) The act of abuse, neglect or endangerment results in serious bodily injury to the child.

T.C.A. § 39-15-402(a)(1). Code section 39-15-401 provides:

Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.

-13-

*Id.* § 39-15-401(b). Code section 37-1-412, regarding a violation of the duty to report, provides that "[a]ny person who knowingly fails to make a report required by § 37-1-403 commits a Class A misdemeanor." *Id.* § 37-1-412(a). Code section 37-1-403 provides, in pertinent part:

> Any person who has knowledge of or is called upon to render aid to any child who is suffering from or has sustained any wound, injury, disability, or physical or mental condition shall report such harm immediately if the harm is of such a nature as to reasonably indicate that it has been caused by brutality, abuse or neglect or that, on the basis of available information, reasonably appears to have been caused by brutality, abuse or neglect.

*Id.* § 37-1-403(a).

An examination of the two statutes reveals that all of the elements of a violation of the duty to report are not included within the offense of aggravated child neglect. As explained, aggravated child neglect has three elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." *Sherman*, 266 S.W.3d at 404. A violation of the duty to report requires a showing that (1) a person knows about or has been asked "to render aid to any child who is suffering from or has sustained any wound, injury, disability, or physical or mental condition"; (2) "the harm is of such a nature as to reasonably indicate that it has been caused by brutality, abuse or neglect or that, on the basis of available information, reasonably appears to have been caused by brutality, abuse or neglect"; (3) the person has failed to report the harm to the appropriate authorities. T.C.A. § 37-1-412(a). Because all of the elements of a violation of the duty to report are not included within the offense of aggravated child neglect, violation of the duty to report does not meet the statutory definition of a lesser included offense, and the trial court did not err by refusing to provide a jury instruction on that offense.

*V. Sentencing*

In his final claim for relief, the defendant asserts that the trial court erred by imposing a Range II sentence when the State failed to file a notice seeking enhanced punishment as required by Code section 40-35-202. The State contends that the defendant waived any complaint regarding his range classification by conceding at the sentencing hearing that he was a Range II offender.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40 35 103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40 35 210(e)). Ultimately, under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

Code section 40-35-202 provides:

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement, which shall not be made known to the jury determining the guilt or innocence of the defendant on the primary offense, must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions. The original or certified copy of the court record of any prior felony conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named in the record is the same as the defendant before the court, and is prima facie evidence of the facts set out in the record.

T.C.A. § 40-35-202(a). "The purpose of the requirement is to provide the defendant with 'fair notice' that he is exposed to something other than standard sentencing. It is intended to facilitate plea-bargaining, to inform plea decisions, and to assist with trial strategy." *State v. Benham*, 113 S.W.3d 702, 705 (Tenn. 2003) (quoting *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990)).

> [T]he notice provision of Tenn. Code Ann. § 40-35-202(a)
> requires, at a minimum, that the State file: (1) written notice,
> (2) clearly expressing the State's intention to seek sentencing
> outside of the standard offender range, (3) setting forth the
> nature of the prior felony conviction, the dates of the
> convictions, and the identity of the courts of the convictions.

*State v. Livingston*, 197 S.W.3d 710, 713-14 (Tenn. 2006) (footnote omitted). "Failure to file any notice to seek enhanced sentencing pursuant to Tennessee Code Annotated section 40-35-202(a) is grounds for re-sentencing as a Range I offender." *State v. Cooper*, 321 S.W.3d 501, 507 (Tenn. 2010) (citing *State v. Pender*, 687 S.W.2d 714, 719–20 (Tenn. Crim. App. 1984)).

The defendant correctly points out that no notice appears in the record on appeal. At the sentencing hearing, however, the State indicated that it had "provided notice to [the defendant] prior to trial that he was a Range II offender." Also at the sentencing hearing, the defendant acknowledged both his criminal record and his release eligibility classification: "[The defendant] absolutely 100 percent does have a record and that record makes him a Range II . . . ." Because the defendant acknowledged at the sentencing hearing that he had notice of his record and that he was a Range II offender, we are not inclined to conclude that the absence of the required statutory notice from the appellate record indicates that the State actually failed to file notice as required under Code section 40-35-202. Consequently, the trial court did not err by imposing a Range II sentence.

*Conclusion*

The evidence adduced at trial was insufficient to support the defendant's conviction of aggravated child neglect. Accordingly, we reverse the judgment of the trial court and dismiss the charge against the defendant.

_____
JAMES CURWOOD WITT, JR., JUDGE

-16-